UNITED STATES v. CHICAGO, B. & Q. R. CO.

(District Court, W. D. Missouri, St. Joseph Division. June 14, 1910.)

ANIMALS (§ 34*)—QUARANTINE REGULATIONS — FEDERAL STATUTE—OFFENSES BY CARRIERS.

Under Act March 3, 1905, c. 1496, § 2, 33 Stat. 1264 (U. S. Comp. St. Supp. 1909, p. 1185), which provides that "no railroad company * * * shall receive for transportation or transport from any quarantined state or territory * * * or from the quarantined portion of any state or territory * * * into any other state or territory * * * any cattle or other live stock except as hereinafter provided," it is only the railroad company which receives for transportation and transports cattle from the quarantined state or district into another state or territory in violation of the authorized regulations prescribed thereunder by the Secretary of Agriculture that is subject to the penalty imposed by the act, and a connecting carrier, which receives such cattle in another state and transports them therein to their destination, without actual knowledge that they came from an infected district, cannot be convicted of a misdemeanor under section 6 of the act, because it did not placard the car or mark the waybill to indicate such fact, as required by the regulations of the first carrier.

[Ed. Note.—For other cases, see Animals, Cent. Dig. § 93; Dec. Dig. § 34.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Criminal prosecution by the United States against the Chicago, Burlington & Quincy Railroad Company. Trial to the court by agreement. Verdict and judgment for defendant.

Leslie J. Lyons, Asst. U. S. Dist. Atty.

H. J. Nelson, for defendant.

PHILIPS, District Judge. The indictment is predicated of section 2 of the act of March 3, 1905 (33 Stat. 1264, c. 1496 [U. S. Comp. St. Supp. 1909, p. 1185]), charging the defendant with transporting a car load of cattle from Maud, in the state of Oklahoma, in May, 1908, within the quarantine district prescribed by the Department of Agriculture, in violation of the regulations of said department. The case has been submitted to the court upon the following agreed statement of facts:

"It is hereby stipulated and agreed between the plaintiff and defendant in this cause that a jury shall be and is hereby waived, and this cause is submitted to the court upon the following agreed statement of facts:

"It is agreed and admitted that the defendant is a corporation organized under the laws of the state of Illinois, and that during the month of May, 1908, it was engaged in the business of a common carrier of live stock and in the transportation of interstate commerce between various states of the United States; that defendant's line of railroad connected at Kansas City, Mo., with the railroad of the Missouri, Kansas & Texas Railway Company; that on or about the 16th day of May, 1908, one Peter Hansen shipped from Maud, Okl., over the Missouri, Kansas & Texas Railway, 28 head of cattle consigned to Davis & Son at St. Joseph, Mo.; that in the ordinary course of business the car containing said 28 head of cattle was delivered to defendant by said Missouri, Kansas & Texas Railway Company at Kansas City, Mo., on or about May 18, 1908, and was carried by defendant from Kansas City, Mo., to St. Joseph, Mo., and there delivered to consignee on May 18, 1908, in the original car into which the cattle were loaded by said Hansen at Maud, Okl., to wit, C. C. C. car 774; that said 28 head of cattle and the car containing the same were, when so delivered to defendant at Kansas City, Mo., accompanied by the original waybill made by said Missouri, Kansas & Texas Raillway Company at Maud, Okl., said cattle having been waybilled through from Maud to St. Joseph; that a true copy of said original waybill is attached hereto, marked 'Exhibit A' and made a part hereof; that said original waybill described said cattle as being 'Native Cattle,' and was not stamped with the words 'Southern Cattle'; that the waybill did not show said cattle to be 'Southern Cattle,' and that the said car in which they were transported was not placarded as containing 'Southern Cattle' with cards of any kind or size; that when said cattle, car, and waybill were so delivered to the defendant by said Missouri, Kansas & Texas Railway at Kansas City, Mo., the defendant had no knowledge or information as to the point or origin of said cattle, or as to the kind, class, or origin of said cattle, other than as shown upon said original waybill so made by said Missouri, Kansas & Texas Railway Company.

"It is further agreed that at the time said shipment of cattle was made from Maud, Okl., the said Maud, Okl., was located within the quarantined area from which cattle were required to be shipped in cars placarded 'Southern Cattle' and upon waybills describing the cattle as 'Southern Cattle,' all in accordance with the quarantine regulations promulgated by the Secretary of Agriculture of the United States, and duly published."

It is not easy to understand why the government selected this defendant for prosecution, rather than the Missouri, Kansas & Texas Railway Company. The latter was the carrier that received the cattle and billed the car out at Maud, Okl., for transportation beyond the

884      181 FEDERAL REPORTER.

state to St. Joseph, Mo. The regulations of the Department of Agriculture imposed upon it the duty of plainly writing or stamping upon the face of the waybill the words "Southern Cattle," so as to indicate that the cattle were from the quarantined district. The further requirement was to conspicuously placard the car containing the cattle with the words "Southern Cattle." The fact that this company instead wrote conspicuously across the face of the waybill the words "Native Cattle" tends to indicate that it connived at an evasion of the quarantine regulations. Its failure to properly placard the car, and turning it and the waybill over to the defendant company at Kansas City, Mo., were well calculated to mislead the latter company in taking the car into its train for transportation to St. Joseph, Mo. So there was no conceivable difficulty in obtaining the fullest evidence of its culpability.

There is no charge or proof that the required placard became detached or defaced during the transportation conducted by the defendant, so as to make it answerable for failure to replace the same. The regulation in this respect is as follows:

"If for any reason the placards required by this regulation are removed from the car, or are destroyed or rendered illegible, they shall be immediately replaced by the transportation company or its agents; the intention being that legible placards shall be maintained on the car from the time such shipments leave the quarantined area until they arrive at final destination."

From which it is clear that unless the car had been placarded by the Missouri, Kansas & Texas Railway Company, which brought it from the state of Oklahoma, and it had been destroyed or rendered illegible, there was no obligation imposed by this regulation upon the defendant company to put on such placard in the first instance. Neither is there any charge in the indictment that the defendant had neglected to replace a destroyed or illegible placard. Its liability to indictment must, therefore, in so far as the indictment charges and the proof submitted goes, depend upon its mere failure to note the words in the upper left-hand corner of the waybill "from Maud, Okla.," and the inference to be drawn therefrom, against the more palpable facts that conspicuously written across the face of the waybill were the words "Native Cattle," indicating that they were not from an assumed infected district, and the absence of any placard on the car in large words "Southern Cattle," which placard, by the regulations aforesaid, was required "to show the name of the place from which the shipment was made, the date of the shipment, the name of the transportation company, and the name of the place of destination." Those were the signs prescribed by the regulations to indicate to other persons than the shipper taking the cattle out of the district that they had come from within the quarantine lines.

It must be conceded that, as this is a criminal prosecution, the guilty knowledge of this defendant is an indispensable element of the offense, and the burden of proof rests upon the government to establish this fact beyond a reasonable doubt in the mind of the trier of the facts. Under the circumstances of this case I would seriously hesitate to find this defendant guilty.

Aside from this, the question arises in my mind: Does the carrier connecting with the railroad company that received the shipment within the prescribed quarantine territory, and after the transportation has passed into another state and the connecting carrier only carries the car within the state where it received it, also become liable to indictment, whereby the government might recover a penalty from each of said carriers? The statute in question is as follows:

"That no railroad company * * * shall receive for transportation * * * from any quarantined state or territory, etc., into any other state or territory * * * any cattle or other live stock, except as hereinafter provided."

The after provision referred to is section 3, which authorizes the Secretary of Agriculture to make regulations for inspection, etc., and removing inspected cattle, etc.

It is only the railroad company that receives "for transportation from any quarantine state into any other state or territory any cattle or other live stock" that may be guilty of a misdemeanor provided for in the sixth section of the act. Such transportation, as applied to the situation under consideration, must be interstate to give jurisdiction to this court over the offense. It was the Missouri, Kansas & Texas Railway Company that received the cattle in the state of Oklahoma for transportation. It crossed the line with the cattle, bringing them through the states of Oklahoma and Kansas into Kansas City, Mo., where the car was transferred by it to the defendant, which only carried the car from Kansas City to St. Joseph, within the state of Missouri.

The succeeding clause of said section 2 of the statute is as follows:

"Nor shall any person, company or corporation deliver for such transportation to any railroad company, etc., nor shall any person, company or corporation drive on foot or cause to be driven on foot, or transport in private conveyance or cause to be transported in private conveyance from a quarantine state or territory, etc., into any other state or territory, etc., any cattle or other live stock, except as hereinafter provided."

Thus again indicating that only the person, company, or corporation that drives or causes to be driven or transported in private conveyances, etc., such live stock "from a quarantine state, etc., into another state, etc., any cattle or other live stock," is subjected to punishment by the statute. Nothing whatever is expressed by the statute respecting the liability of any connecting carrier or driver of the cattle after they pass beyond the quarantine district into another state or territory. Suppose that the shipment in question had been from Maud, Okl., to Chicago, and been carried by the Missouri, Kansas & Texas Railway Company in its car through the states of Kansas, Missouri, and Illinois, with the car not placarded and the waybill just as the one in question, would there have been more than one offense? The only offense for which it could have been indicted would have been for shipping the cattle from the state of Oklahoma into another state without complying with the regulations of the Department of Agriculture. The offense was completed by the last-named act the moment it crossed the line between Oklahoma and Kansas. Can it make any difference, under the language of the statute, that after the Missouri, Kansas & Texas Rail-

way Company got across the line into Kansas it turned over the transportation of the car for carriage to its destination to another carrier? The statute has neither in terms nor spirit subjected both the carrier that brought the cattle out of Oklahoma into Missouri and the connecting carrier, who completes the unfinished part of the transportation inside of the latter state, to punishment.

There has been considerable discussion among the judges of various districts as to whether or not what is known as the "Twenty-Eight Hour Law," respecting the interstate shipment of live stock, admits of the construction that the length of time consumed in the transportation by the antecedent carrier can be carried over and charged to the connecting carrier, who does not run over the 28 or 36 hours time without unloading, feeding, and watering. In United States v. Stockyards Terminal Co. (C. C.) 172 Fed. 452, Judge Willard held that where the initial carrier of live stock has been subjected to the penalty imposed by Act June 29, 1906, c. 3594, § 1, 34 Stat. 607 (U. S. Comp. St. Supp. 1909, p. 1178), for confining live stock longer than permitted without unloading, rest, water, and feeding, a second action against a connecting carrier to recover for the same confinement, the first 28 hours or 36 hours which were necessarily included in the first action cannot be counted against the defendant or the connecting line. Contra, United States v. Northern Pacific Terminal Co., 181 Fed. 879, by Judge Wolverton.

It is to be noted that the last statute declares that no railroad company "whose road forms any part of a line or road over which cattle, sheep, swine, or other animals shall be conveyed from one state or territory * * * into another state or territory * * * shall confine the same in cars * * * for a period longer than 28 consecutive hours without unloading the same in a humane manner into properly equipped pens for rest, water and feeding," with the proviso of a period of 36 hours on request of shipper.

As each railroad successively carrying the live stock forms a part of the continuous line, the language of the statute may be held reasonably to extend to the respective carriers making up the entire line. From this difference in the respective statutes, which are germane, touching the transporting of cattle, where the Congress intended to penalize all the roads handling such live stock forming any part of the line of the interstate carriage, it has said so in terms. The statute in question employed no correlative language signifying a purpose to subject any railroad company carrying such cattle over its own road after the first carrier completed the offense denounced by the statute by bringing the cattle "from the state," within the quarantine district, into "another state."

The defendant company did not bring the cattle from Oklahoma into another state; and the regulation prescribed by the Department of Agriculture for billing and placarding the car was imposed upon the railroad company shipping the cattle out of the quarantine district into another state or territory.

While such remedial statutes, even in a criminal proceeding, are to be liberally construed so as to effectuate the legislative intent, it is to be kept in mind that it is none the less a penal statute, not to be extended

by mere implication beyond the terms in which it is expressed. In the zeal and eagerness sometimes born of newly created statutory offenses, there is at times manifested a disposition to press the courts for a most latitudinarian construction. But the courts should recognize the dangerous evil of legislation by judicial construction, and incline them to await the advance by the lawmaking branch of the government.

Verdict and judgment for defendant.